## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO: 09-60330-CR - Middlebrooks /
Johnson

18 U.S.C. 371

UNITED STATES OF AMERICA,

v.

JOSEPHUS EGGELLETION,
(a/k/a "Joe")
Defendant,

_____/

### INFORMATION

### THE UNITED STATES ATTORNEY CHARGES THAT:

### BACKGROUND

1.  Beginning in or about April 2005, the Federal Bureau of Investigation (hereinafter

referred to as the "FBI") initiated an investigation into public corruption in South Florida.

During the course of the undercover operation, the FBI utilized three (3) FBI agents acting in an

undercover capacity. Two of the undercover FBI agents posed as asset managers, who, along

with a cooperating witness, among other services, purportedly represented individuals seeking to

protect and or hide assets. The third undercover FBI agent posed as the "boss" or employer of the

asset managers.

2.  In or about February 27, 2006, the undercover agents were introduced by F.S., a local

area politician, to defendant JOSEPHUS EGGELLETION , who, at that time, served as a

member of the Broward County Commission as well as vice-mayor of Broward County.

3.  On or about  May 30, 2006, defendant EGGELLETION stated to an undercover agent

and a cooperating witness, "If you wanna do some deals in the Bahamas let me know. Yes sir. In fact I'm gonna be raising some money for the prime minister of the Bahamas that's running for re-election."

## THE CONSPIRACY

4. Beginning in or around early 2006, and continuing through on or around September 2, 2009, in Broward and Miami-Dade Counties, in the Southern District of Florida and elsewhere, the defendant,

**JOSEPHUS EGGELLETION,**
(a/k/a "Joe")

did knowingly and willfully combine, conspire, confederate, agree and reach a tacit understanding with at least one other person, known and unknown to the United States Attorney, to commit offenses against the United States, that is,

a) to knowingly and willfully, with the intent to conceal and disguise the nature, location, source, ownership and control of property the defendant believed to be the proceeds of specified unlawful activity, conduct and attempt to conduct, a financial transaction affecting interstate and foreign commerce involving property represented by a law enforcement officer, to be proceeds of specified unlawful activity, that is, mail and/or wire fraud involving a purported investment fraud scheme, in violation of Title 18, United States Code, Sections 1956(a)(3)(B) and 2, and;

b) to willfully make and subscribe a false United States Income Tax Return (Form 1040) for the calendar year 2007, which was verified by written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service Center in Atlanta, Georgia, which said income tax return he did not believe to be true and correct as to every material matter, in that said return reported income amounts in the form of salary, wages and pension annuities

where, as he then and there well knew and believed, he failed to report additional income derived from cash payments in the amount of approximately $18,200, in violation of Title 26, United States Code, Section 7206(1).

## OBJECTS OF THE CONSPIRACY

5. It was an object of the conspiracy for defendant EGGELLETION to unjustly enrich himself by obtaining fees for the laundering of monies represented to be the proceeds of specified unlawful activity through Bahamian bank accounts.

6. It was further an object of the conspiracy for defendant EGGELLETION to evade paying federal income taxes on the cash fees he received for laundering monies represented to be the proceeds of specified unlawful activity.

## OVERT ACTS

In furtherance of the above-described conspiracy and to effect the objects thereof, the defendant and other co-conspirators committed one or more of the following overt acts, among others, in Broward and Miami-Dade Counties, in the Southern District of Florida and elsewhere:

7. On or about July 31, 2006, after the undercover agents had indicated they were interested in opening off-shore bank accounts on behalf of a client, defendant EGGELLETION agreed to provide contacts with bankers in the Bahamas, stating that, in the Bahamas, he does not have to adhere to the ethical restrictions he has in the United States.

8. On or about November 15, 2006, defendant EGGELLETION told A.I., a hotelier with connections in the Bahamas, that certain persons needed help setting up a Bahamian company and bank account for their client.

3

9.   On or about December 6, 2006, defendant EGGELLETION told the an undercover agent and a cooperating witness that, if A.I. didn't come through in the next few days, they should call "my man," E.D., who has "very good connections in the Bahamas" and acknowledged that he would be compensated for his help.

10.   On or about December 15, 2006, after defendant EGGELLETION was informed by an undercover agent and a cooperating witness that they were seeking to hide their client's proceeds from a European high yield investment fraud scheme that was sending out "made up" statements to clients, EGGELLETION stated that he would not introduce them to someone that would harm them.

11.   On or about January 31, 2007, defendant EGGELLETION advised an undercover agent that "those guys," referring to A.I. and K.G., did not want to do anything, as they were "frightened" and "skeptical" so EGGELLETION advised he would just go to other sources.

12.   On or about February 9, 2007, defendant EGGELLETION told an undercover agent it would be better to take a trip to the Bahamas and "...don't give em...don't give folk a whole lot of...the less they know the better off you may be," referring to their reason for setting up the Bahamian bank account.

13.   On or about February 14, 2007, defendant EGGELLETION introduced the undercover agent and a cooperating witness to co-conspirator Joel Williams for the purpose of assisting the undercover agent and cooperating witness in opening a bank account in the Bahamas.

14.   On or about February 24, 2007, defendant EGGELLETION introduced the undercover agents to co-conspirator Ronald Owens, who was to work with co-conspirator

Williams regarding the undercover agents' banking needs in the Bahamas.

15.  On or about March 6, 2007, at Nassau, Bahamas, co-conspirator Williams and co-conspirator Owens met with the undercover agent and a cooperating witness who told Williams and Owens that they had a client who ran an investment club who was going to "get caught" and "sooner or later he will get screwed" and further advised that they planned to hide their client's income by putting his money in an account in the Bahamas and then moving the money to another account on another island.

16.  On or about March 6, 2007, at Nassau, Bahamas, co-conspirator Williams said to an undercover agent and a cooperating witness that, in the Bahamas, they did not call it laundering money, as long as the money did not come from arms, drugs, or terrorists.

17.  On or about March 6, 2007, at Nassau, Bahamas, based on defendant EGGELLETION's instructions, co-conspirator Owens told an undercover agent and a cooperating witness that whatever defendant EGGELLETION's "points" (fees) were, that money would have to come to co-conspirators Owens and Williams first to prevent a trail that would show in the United States.

18.  Later, on or about March 6, 2007, at Nassau, Bahamas, co-conspirators Owens and Williams, along with an undercover agent and a cooperating witness, met with co-conspirator Sidney Cambridge and agreed that, for every deposit that came into the bank, defendant EGGELLETION, along with co-conspirators Owens, Williams and Cambridge, would receive a percentage of the money laundered.

19.  Also, on or about March 6, 2007, co-conspirator Cambridge provided an undercover agent with an application for opening an International Business Corporation

(hereinafter "IBC") and wiring instructions to co-conspirator Cambridge's trust account at First Caribbean International Bank (hereinafter "FCIB") in Nassau, Bahamas.

20.   On or about March 23, 2007, co-conspirator Cambridge took receipt of a $100,000 wire transfer into his trust account at FCIB in Nassau, Bahamas, purportedly from undercover agents, from a bank account in Miami, Florida.

21.   On or about March 24, 2007, co-conspirators Owens and Williams met with undercover agents and a cooperating witness and agreed that defendant EGGELLETION would be paid a cash fee of two percent of the total amount laundered for his role in the money laundering operation.

22.   On or about March 28, 2007, at Nassau, Bahamas, co-conspirator Cambridge took an undercover agent to the office of S. B., a banker with FCIB, to be interviewed and sign documents opening a bank account, at FCIB, in the name of Hexagon Development.

23.   On or about March 30, 2007, per defendant EGGELLETION's instructions, co-conspirator Owens told an undercover agent that any "package" for defendant EGGELLETION had to come to Owens first.

24.   On or about March 30, 2007, co-conspirator Owens took receipt of $7000 in cash from an undercover agent, which also included the payments for defendant EGGELLETION and two other co-conspirators.

25.   On or about April 4 and 13, 2007, co-conspirator Cambridge transferred a total of $97,000 from his bank account at FCIB to the Hexagon Development account at FCIB.

26.   On or about May 21, 2007, co-conspirator Cambridge caused a Hexagon Development bank account at FCIB, in Nassau, Bahamas, to take receipt of a $200,000 wire

6

transfer from a bank account in Miami, Florida, purportedly from the undercover agents.

27. On or about June 6, 2007, co-conspirator Cambridge caused a wire transfer of $199,000 to be made from the Hexagon Development bank account at FCIB, in Nassau, Bahamas, to a bank account in St. Croix.

28. On or about June 6, 2007, co-conspirators Owens and Williams took receipt of $14,000 in cash from an undercover agent, representing seven percent of the $200,000 purported money laundering transaction, with co-conspirator Owens stating that "the third party" (defendant EGGELLETION ) was splitting $10,000 with him and co-conspirator Williams, and that the remaining $4,000 was to be paid to co-conspirator Cambridge.

29. On or about June 8, 2007, co-conspirator Owens advised an undercover agent that he put defendant EGGELLETION's share of the $200,000 purported money laundering transaction fees in defendant EGGELLETION's golf bag while the two were playing golf that morning.

30. On or about August 30, 2007, co-conspirator Cambridge took receipt of a $200,000 wire transfer into his trust account at FCIB in Nassau, Bahamas, from a bank account in Miami, Florida, purportedly from the undercover agents.

31. On or about September 5, 2007, co-conspirator Cambridge transferred approximately $200,000 from his trust account at FCIB in Nassau, Bahamas, to the Hexagon Development account at FCIB.

32. On or about September 12, 2007, co-conspirator Owens instructed an undercover agent to put his and defendant EGGELLETION's portion of the $14,000 cash fee for their $200,000 purported money laundering transaction into two envelopes, one for him and one for

defendant EGGELLETION.

33.   On or about September 12, 2007, co-conspirator Owens took receipt of a white envelope containing $3,300 cash from an undercover agent, representing Owens' portion of the money laundering fee, and also received, from the undercover agent, a black leather passport holder containing $3,300 cash, which represented  defendant EGGELLETION's share of the money laundering fee.

34.   Also, on or about September 12, 2007, co-conspirator Owens attempted to give defendant EGGELLETION  the black leather passport holder with $3,300 cash inside but was told by defendant EGGELLETION that he wanted to do that at another location. Owens later told an undercover agent that defendant EGGELLETION  was just being cautious because of recent arrests.

35.   On or about September  13, 2007, at Miami, Florida,  co-conspirator Williams  took receipt of $3,400 cash from an undercover agent, which was his portion of the money laundering fee and received $4,000 in cash, which was to be paid to co-conspirator  Cambridge  in the Bahamas.

36.  On or about  November 15, 2007,  co-conspirator  Cambridge took receipt of a $200,000 wire transfer into his trust account at FCIB in Nassau, Bahamas, from a bank account in Miami, Florida, purportedly from the undercover agents.

37.  On or about  November 23, 2007,  co-conspirator  Cambridge took receipt of  a $200,000  wire transfer into his trust account at FCIB in Nassau, Bahamas, from a bank account in Miami, Florida., purportedly from the undercover agents.

38.   On or about November 23, 2007, co-conspirators Owens and Williams traveled to

the Bahamas with undercover agents to meet with co-conspirator Cambridge and discuss setting up additional IBCs and bank accounts for the money laundering scheme.

39. On or about November 23, 2007, at Nassau, Bahamas, co-conspirator Cambridge met with an undercover agent and was told by the undercover agent that the funds being wire transferred from Miami came from a "Ponzi" scheme; Cambridge acknowledged his understanding of the purported source of the funds and then instructed the undercover agent on how to launder the proceeds in the Bahamas.

40. On or about November 23, 2007, at Nassau, Bahamas, co-conspirator Cambridge stated to undercover agents that he had only received $2,000, not $10,000, from co-conspirator Williams for his laundering of their funds.

41. On or about November 23, 2007, at Nassau, Bahamas, co-conspirator Cambridge provided a $399,000 check to undercover agents for deposit into the Hexagon Development bank account at FCIB.

42. On or about November 26, 2007, co-conspirator Owens assured an undercover agent that, "Every time I got money, Joe (defendant EGGELLETION) has got the same money. I can guarantee you that."

43. On or about November 28, 2007, at Fort Lauderdale, Florida, co-conspirator Owens took receipt of $5000 cash from an undercover agent as his fee for the November 15, 2007 purported money laundering transaction which involved $200,000.

44. On or about November 28, 2007, at Fort Lauderdale, Florida, defendant EGGELLETION took receipt of a day planner which contained $5000 cash from an undercover agent as his fee for the November 15, 2007 money laundering transaction.

9

45. On or about November 29, 2007, co-conspirator Williams told co-conspirator Owens that it was none of the business of the undercover agents how he (Williams) divided the money he received for laundering money with co-conspirator Cambridge.

46. On or about November 29, 2007, defendant EGGELLETION delivered a letter, along with $5000 cash, to co-conspirator Owens stating he was "shocked" to find money inside the organizer given to him by an undercover agent and since it is illegal he is returning it, but he may need a loan in the future.

47. On or about December 12, 2007, defendant EGGELLETION told an undercover agent he understood co-conspirator Williams had "screwed up" and that he (EGGELLETION) had given co-conspirator Owens the "calendar" he received from the undercover agent on November 28, 2007.

48. Also, on or about December 12, 2007, co-conspirator Owens took receipt of $2,500 cash and a leather day planner containing an additional $2,500 cash for defendant EGGELLETION from undercover agents, which constituted their five percent fee for $100,000 of the $200,000 that was sent through the FCIB account in the name of Hexagon Development in Nassau, Bahamas on November 23, 2007.

49. Also, on or about December 12, 2007, defendant EGGELLETION told co-conspirator Owens that he wanted to "check out" the undercover agents, in that he had to be careful because people want to catch him in criminal activity.

50. On or about December 13, 2007, co-conspirator Owens explained, to an undercover agent, that defendant EGGELLETION did receive the payment on November 28, 2007, and only claimed that he gave him (Owens) back the money because he (EGGELLETION) was very

10

nervous about being caught by law enforcement.

51. On or about December 17, 2007, co-conspirator Owens told an undercover agent that defendant EGGELLETION wanted him to hold onto his fee for $100,000 of the $200,000 November 23, 2007 money laundering transaction.

52. On or about December 18, 2007, at Fort Lauderdale, Florida, co-conspirator Owens took receipt of $2,500 cash and a leather portfolio folder also containing $2,500 cash from undercover agents, which represented Owens' and defendant EGGELLETION's fees for the remaining $100,000 of the November 23, 2007 money laundering transaction.

53. On or about December 18, 2007, co-conspirator Owens stated to an undercover agent that defendant EGGELLETION instructed him to hold onto his $2500 payment for the November 23, 2007 money laundering transaction and further advised that he (Owens) was now holding $5000 for EGGELLETION.

54. On or about December 19, 2007, co-conspirator Owens stated, to an undercover agent, that he didn't want to be defendant EGGELLETION's "bagman" and, therefore, he was thinking of opening a bank account in his company's name and giving EGGELLETION a cash card with his own pin number.

55. On or about January 30, 2008, co-conspirator Owens, at Sunny Isles, Florida, met with undercover agents and took receipt of $25,000 cash which represented his and defendant EGGELLETION's fees for a purported $500,000 money laundering transaction.

56. On or about February 8, 2008, defendant EGGELLETION met with Owens, after Owens said that he was now holding $15,000 for him and advised that there would be another $5000 next week.

57.  On or about February 15, 2008, defendant EGGELLETION told Owens to just put the $15,000 he was holding for him away, since he would need it to take care of his attorney.

58.   On or about the morning of February 22, 2008, defendant EGGELLETION met with Owens and, after being told by Owens that the undercover agents could be charged with money laundering "ponzi scheme money," claimed he did not know what they were doing, thought it was just an investment fund they were putting over there, and said it should be checked out if it is illegal.

59.  On or about the afternoon of February 22, 2008, at Hollywood, Florida, defendant EGGELLETION met with Owens and took possession of a black leather day planner containing $15,000 cash, which represented EGGELLETION's share of proceeds from purported money laundering transactions.

60.  Also, on or about the afternoon of February 22, 2008, defendant EGGELLETION told Owens that if the undercover agents talk about the money he should tell them that "I don't wanna know about that" and he (EGGELLETION) would prepare consulting agreements about what they did in the Bahamas so they would be "legit, straight up."

61. On or about October 15, 2008, defendant EGGELLETION caused to be filed a 2007 Federal Income Tax Return, Form 1040, that failed to disclose approximately $18,200 in cash payments/income he earned in calendar year 2007 in fees for money laundering transactions.

62. On or about September 2, 2009, defendant EGGELLETION caused to be filed a false State of Florida Full and Public Disclosure of Financial Interests which listed the $15,000

obtained from co-conspirator Owens on February 22, 2008 as a liability owed to Owens.

All in violation of Title 18, United States Code, Section 371.


JEFFREY H. SLOMAN
ACTING UNITED STATES ATTORNEY


NEIL KARADBIL
ASSISTANT UNITED STATES ATTORNEY

13

**UNITED STATES OF AMERICA**

vs.

**JOSEPHUS EGGELLETION,**
　　　　(a/k/a "Joe")

　　　　　　　**Defendant.**
_____/

**CASE NO.** _____

# CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information:**

**Court Division**: (Select One)

| | | | |
|---|---|---|---|
| ___ | Miami | ___ | Key West |
| _X_ | FTL | ___ | WPB   ___ FTP |

New Defendant(s)　　　　　　Yes _____　No ___
Number of New Defendants　　_____
Total number of counts　　　_____

I do hereby certify that:

1.　I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.　I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.　Interpreter:　　(Yes or No)　　_No_
　　List language and/or dialect　_English_

4.　This case will take　_1_　days for the parties to try.

5.　Please check appropriate category and type of offense listed below:

　　(Check only one)　　　　　　　　　　　　　(Check only one)

| | | | | | |
|---|---|---|---|---|---|
| I | 0 to 5 days | _X_ | Petty | _____ |
| II | 6 to 10 days | _____ | Minor | _____ |
| III | 11 to 20 days | _____ | Misdem. | _____ |
| IV | 21 to 60 days | _____ | Felony | _X_ |
| V | 61 days and over | _____ | | |

6.　Has this case been previously filed in this District Court? (Yes or No)　_Yes_
If yes:
Judge:　_HURLEY_　　　　Case No.　_09-60302-CR-HURLEY_
(Attach copy of dispositive order)
Has a complaint been filed in this matter?　(Yes or No)　_Yes_
If yes:
Magistrate Case No.　_09-6357-CR-SNOW_
Related Miscellaneous numbers:　_____

Defendant(s) in federal custody as of　_____
Defendant(s) in state custody as of　_____
Rule 20 from the　_____　District of　_____

Is this a potential death penalty case? (Yes or No)　_No_

7.　Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?　_____ Yes　_X_ No

8.　Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?　_✓_ Yes　___ No

　　　　　　　　　　　　_____
　　　　　　　　　　　　NEIL KARADBIL
　　　　　　　　　　　　ASSISTANT UNITED STATES ATTORNEY
　　　　　　　　　　　　Florida Bar No./Court No. 219381

*Penalty Sheet(s) attached

REV 4/8/08

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

PENALTY SHEET

**Defendant's Name**: **JOSEPHUS EGGELLETION**

**Case No**: 09-60302-CR-HURLEY

Count #: 1

Conspiracy to Commit Money Laundering: in violation of 18 U.S.C. 371

\* **Max.Penalty**:      5 years' imprisonment; $250,000 fine & 3 years' supervised release

Count #: 2

\*Max. Penalty:

Count #: 3

\*Max. Penalty:

Count #: 4

\*Max. Penalty:

**\*Refers only to possible term of incarceration, does not include possible fines, restitution,**
**special assessments, parole terms, or forfeitures that may be applicable.**